*In re* MARRIAGE OF HELEN J. OLBRECHT, Petitioner-Appellant, and THEODORE M. OLBRECHT, Respondent-Appellee.

First District (1st Division)   Nos. 1—90—0828, 1—90—2897 cons.

Opinion filed May 11, 1992.—Rehearing denied August 26, 1992.

Michael D. Canulli, of Oak Brook, for appellant.

Brooks, Hankins & Swiatkowski, Ltd., of Orland Park (George W. Brooks, of counsel), for appellee.

JUSTICE CAMPBELL delivered the opinion of the court:

Petitioner Helen Olbrecht appeals from several portions of a judgment of dissolution of her marriage to respondent, Theodore (Ted) Olbrecht. On appeal, Helen contends that the trial court erred in: (1) classifying the home in which she and Ted lived as nonmarital property; (2) ruling that $20,000 paid toward the home was not a wedding gift; (3) ruling that she was not entitled to reimbursement for contribution to nonmarital property; (4) ruling that she was not entitled to a portion of the insurance proceeds for the fire-destroyed garage; (5) denying her emergency motion to void the deed of conveyance; and (6) awarding joint custody of their three children. Ted cross-appeals from the judgment order requiring him to pay Helen's attorney fees and costs of $6,000. For the following reasons, we affirm in part and reverse and remand in part.

The following facts are relevant to this appeal. Helen and Ted were married on October 2, 1976. At the time of the dissolution proceeding, Helen was 34 and Ted was 40. Three children were born of the marriage, James, Michelle, and Michael, ages 11, 9 and 7, respectively. In June 1988, the parties separated and Ted moved into his own apartment.

Helen and Ted began dating when Helen was a 15-year-old high school sophomore and Ted was 21 and working full time. The parties became engaged in April 1974 and began to discuss where they were going to live after the marriage. At that time, both Helen and Ted expressed a preference for living in a house rather than an apartment.

In the spring of 1976, Helen, Ted and Ted's aunt, Harriet Sniechowski, first discussed purchasing a home wherein Harriet could live with Ted and Helen in an in-law, i.e., separate apartment, arrangement. Helen testified that Harriet said she would give Ted and Helen $20,000 as a wedding gift, to be used as a down payment for a home that the parties could all share. Harriet indicated that she wanted her name on the title to the house and the parties agreed. The next day, Helen, Ted and Harriet met with a realtor and the four began to look at properties. When they viewed the home at 5129 West 22nd Place, Helen told Ted "it would be a perfect place to grow a family," and they agreed to draw up a contract. At that time, Ted told Helen privately that Harriet would be uncomfortable if Helen's name appeared

on the title before they were married. Helen did not object to this arrangement based on Ted's assurances that she could trust him.

In June 1976, Helen and Harriet attended the closing on the house because Ted was working. Helen signed Ted's name on the closing documents. The home was purchased for $43,900 and title was drawn in Ted and Harriet's names as joint tenants. Harriet put down $4,000 for earnest money and the remaining $16,000 as a down payment on the house. Ted did not contribute any money from his personal funds. In July 1976, Helen moved into the house some time prior to Ted, and the parties lived together in the house until and after their wedding in October 1976.

Helen stated that during the entire 13 years of the marriage, she and Ted paid the mortgage out of a joint checking account, and Harriet gave them cash for half of the mortgage payment. There was no written agreement regarding Harriet's cash payments. At no time did Harriet indicate that Ted and Helen would have to repay the $20,000.

Helen stated that Ted considered Harriet's money "rent" and that Harriet never took the position that she was the sole owner of the property. As evidence of Harriet's recognition that Helen owned the home, Helen submitted a note she wrote to Harriet after Ted moved out:

> "Please note I do not want anyone in my house when I am not home, including the basement. Make an appointment with me so I will be at home next week one day for the electrician to come through. I have to be home and no one comes in. P.S. Thanks for your consideration."

Helen stated that her brother helped with remodeling and construction on the house and that she and Ted spent approximately $10,000 on home improvements. Harriet paid to fence in the yard.

In 1988, vandals set fire to the garage on the property and Helen signed a complaint against them and went to court. Neither Ted nor Harriet participated in Helen's complaint or went to court. An insurance check for $2,936.54 was issued in Ted's and Harriet's names; Ted received the check and signed it over to Harriet.

Ted testified that he, Helen and Harriet looked at properties in the spring of 1976 with the thought that Harriet would live upstairs and Ted and Helen would live on the main level. He admitted that Harriet never requested repayment of the $20,000, but stated that the money was not a wedding gift:

> "It [buying a house] was an opportunity for me, because I was just getting married and I was really worried about it, I was

looking at apartments they were all more than $122 at that time.

* * *

This was a great deal for me because it was three bedrooms. I felt that when we had children in the future, they can go in the bedrooms, there was a lot of room."

Ted admitted that Helen moved into the house before he did. Ted stated that he arranged with Harriet that she would pay one half the mortgage, utilities and insurance on the house; however, the utilities were in Ted's name only, and the agreement was never reduced to writing. Ted described his "half" payment as "rent" payable to Harriet, although he admitted that there was no lease concerning his and Helen's occupancy of the property, that he referred to the payments as mortgage payments, and that the payments are described as "mortgage payment" on the memorandum line of cancelled checks written on Ted and Helen's joint checking account. Ted also admitted that he took deductions on his income taxes for interest paid on a home mortgage throughout the years and claimed real estate taxes paid on the property every year. Ted admitted that Harriet never deducted any portion of the home on her taxes. Ted stated that he and Helen spent $8,000 to $10,000 on home improvements and that $8,000 came from a workers' compensation settlement he acquired after he broke his wrist on the job.

Harriet testified that in 1976 she was 62 years old, and she asked Ted if he would sign his name to a loan for a house because she was afraid she could not get a mortgage loan on her own.[1] She admitted that she never attempted to acquire a loan on her own. Harriet stated that she paid $20,000 toward the purchase of the property, and although she never considered it a gift, there was nothing in writing requiring Ted and Helen to repay the money. Harriet also stated that Ted and Helen did not sign a lease and that she never had any discussion with Ted about not wanting Helen's name on the title. Each month, Harriet made payments in cash to Ted and Helen for an amount representing half of the mortgage payments. She stated that she did not consider the money as rent. Harriet acknowledged the dispute over the ownership of the house. She stated that she owned half of the house and that if the house was sold:

---

[1]Harriet appeared at trial pursuant to a subpoena served upon her by Helen's attorney, Michael Canulli. Harriet previously testified at a deposition in this case, also pursuant to subpoena by Mr. Canulli.

"Half of the house would belong to me and the other half would go between the two. Between him [Ted] and his wife."

The record indicates that Harriet was never brought into the proceedings by either party through a third-party complaint.

The trial court determined the house to be nonmarital property and awarded the house to Ted. In his ruling, the trial judge stated, "It is undisputed that sometime *after the marriage* Ted, Helen and Harriet moved into the premises at 5129 West 22nd Place in Cicero, Illinois" (emphasis added). The trial court found that the $20,000 was not a gift, that Helen was not entitled to reimbursement through contribution to the property and that she was not entitled to share in the insurance proceeds resulting from the fire destruction of the garage because the property was nonmarital. The trial court awarded the parties joint custody of the children.

Following entry of the order of dissolution, Ted executed a quitclaim deed, conveying his interest in the Cicero property to Harriet. The deed was recorded on May 15, 1990. On August 17, 1990, the trial judge entered an order denying Helen's emergency motion to enjoin the sale of the property, finding that the trial court lacked personal jurisdiction over Harriet. Helen's subsequent emergency motion to void the deed of conveyance was denied by the trial court in an order entered on August 20. On August 30, this court entered a stay of judgment pending appeal as relating to the ownership, possession, or interest in the Cicero property. Helen's timely appeal followed.

The first issue is whether the court erred in determining that the property located at 5129 West 22nd Place, Cicero, Illinois, was nonmarital property. Helen contends that the property was purchased in contemplation of marriage and therefore is marital property. Helen also argues that the $20,000 down payment made by Harriet toward the purchase of the property was a wedding gift. Ted argues that the property is nonmarital because his Aunt Harriet acquired the house prior to the marriage. Ted contends that the $20,000 was not a gift and that he has never maintained any interest in the property, even though his name appears on the title in joint tenancy.

Section 503 of the Illinois Marriage and Dissolution of Marriage Act (Act) provides:

"(a) For purposes of this Act, 'marital property' means all property acquired by either spouse subsequent to the marriage, except the following, which is known as 'non-marital property':

\* \* \*

(6) property acquired before the marriage;

(7) the increase in value of property acquired by a method listed in paragraphs (1) through (6) of this subsection, irrespective of whether the increase results from a contribution of marital property, non-marital property, the personal effort of a spouse, or otherwise, subject to the right of reimbursement provided in subsection (c) of this Section." Ill. Rev. Stat. 1987, ch. 40, par. 503(a).

■ However, in prior cases, this court has looked at the intent of the parties to determine that property acquired "in contemplation of marriage" is marital property, even if purchased prior to the marriage. (See *In re Marriage of Jacks* (1990), 200 Ill. App. 3d 112, 558 N.E.2d 106; *In re Marriage of Ohrt* (1987), 154 Ill. App. 3d 738, 507 N.E.2d 160; *In re Marriage of Malters* (1985), 133 Ill. App. 3d 168, 478 N.E.2d 1068; *In re Marriage of Stallings* (1979), 75 Ill. App. 3d 96, 393 N.E.2d 1065.) In these cases, the courts looked to the totality of the circumstances, finding relevant the following factors: the proximity in time between acquisition of the property and the marriage, whether equity in the property was acquired with marital funds, evidence that the parties intended the property to serve as the marital home, whether the parties' names appear on the offer sheet, and the manner in which title is held (although this last factor is not determinative and may be of no consequence in a given case).

In *Jacks*, the parties viewed the house with a realtor, and the husband stated they intended to purchase a four-bedroom home because the wife had four children from a previous marriage. Both parties' names appeared on the offer sheet, while title to the home was in the husband's name only. The home was purchased with no money down and $1,000 earnest money paid by the husband. The parties married approximately one hour after the closing on the home. All mortgage payments were made with marital funds. The parties lived in the house for four years. The court examined the above factors and found that the property purchased prior to marriage but in contemplation of marriage was marital property. In making its determination, the court held that the timing and manner of holding title is not determinative. *Jacks*, 200 Ill. App. 3d at 118.

In *Stallings*, the parties purchased a home less than two months before their marriage. The wife paid $5,000 for a down payment from her own funds and the balance was financed by a loan. The parties took title as tenants in common, and the mortgage payments were made from marital assets. The court found the home a marital asset, holding that the property was purchased in contemplation of marriage and with the intent that it would be the family home. The court noted

that all the equity in the home was acquired with marital funds and rejected the notion that section 503 of the Act arbitrarily categorizes all property acquired prior to the marriage as nonmarital property. *Stallings*, 75 Ill. App. 3d at 99.

In *Malters*, the parties accompanied a real estate agent to look at a home prior to marriage. Both parties signed the offer sheet to purchase the home. The husband borrowed $5,000 from the wife's father to make the down payment. Title to the house was placed in trust with the husband named as the sole beneficiary. The couple lived in the house for a year prior to the marriage and mortgage payments were made from their joint account. The court affirmed a finding that the home was a marital asset.

In *Ohrt*, the property was purchased approximately two months prior to the marriage. The funds for the down payment were borrowed. Only the husband's name appeared on the title, note and mortgage. The court found the property marital, noting that the property was purchased with the idea that it would be the marital residence, and found "it of no consequence that the property was purchased by defendant prior to the marriage or that title was solely in his name." *Ohrt*, 154 Ill. App. 3d at 742.

In the present case, the record indicates that Helen accompanied Ted, Harriet and the realtor on house-hunting trips. Helen testified that when the four of them viewed the house, they agreed that the house would be "a perfect place to grow a family." Ted testified that he and Helen could not afford a house on their own and that finding a place with an arrangement for Harriet was a "great deal" because the house had three bedrooms which would accommodate future children. The record indicates that although Helen's name did not appear on the offer sheet and that title was held by Ted and Harriet in joint tenancy, Helen represented Ted at the closing and signed his name to the closing documents.

The record further indicates that the house was purchased at the end of June 1976. Helen and Ted moved into the house in July 1976, several months prior to their wedding, and Helen moved into the house before Ted. The parties married at the beginning of October 1976. In classifying the property, the trial court incorrectly stated that the parties moved into the house after their marriage. The record also indicates that Harriet made the down payment for the house and that none of Ted's personal funds were used.

■ The record contains checks for the entire amount of the mortgage written on Ted and Helen's joint account. The memorandum lines on these checks contain the notation "mortgage payment." Al-

though Ted claims he paid rent to Harriet, nothing in the record supports that claim. The record further indicates that Ted took deductions for interest on the property and paid real estate taxes on the property. There is nothing in writing authorizing Ted to pay taxes and take deductions on Harriet's property, nor is there anything in the record indicating that Helen was ever told that she had no rights to the property during the marriage.

In a nonjury trial, where there is conflicting testimony, a trial court's findings will be disturbed only if they are against the manifest weight of the evidence. (*Stallings*, 75 Ill. App. 3d at 100.) Based upon the totality of the above factors, the trial court's judgment that the property was nonmarital was contrary to the manifest weight of the evidence.

However, even considering the totality of the circumstances, the record in the present case lacks evidence as to the marital nature of the *entire* home because Harriet's *interest* in the home has not been adequately addressed. Where the evidence as to the marital nature of property is unclear and inconclusive so as to be lacking, this issue must be further determined on the basis of competent evidence on remand. *In re Marriage of Cuisance* (1983), 115 Ill. App. 3d 551, 557, 450 N.E.2d 1302.

The record suggests that Harriet was a joint tenant in property that was part of the subject matter of the litigation. The record further indicates that the mortgage, repairs and improvements and insurance were paid both by Harriet and out of the parties' marital funds, evidence of a joint tenancy. Harriet stated that if the property was sold, "half of the house would belong to me and the other half would go between the two. Between him [Ted] and his wife."

Thus, the classification and subsequent distribution of the property inevitably affected Harriet's interest as a necessary party. A necessary party is one who has a legal or beneficial interest in the subject matter of the litigation and will be affected by the action of the court. (*In re Marriage of Peshek* (1980), 89 Ill. App. 3d 959, 966, 412 N.E.2d 698.) A trial judge in the domestic relations division of the circuit court constitutionally has jurisdiction to hear all justiciable matters. (*In re Marriage of Schweihs* (1991), 222 Ill. App. 3d 887, 894-95, 584 N.E.2d 472; *Peshek*, 89 Ill. App. 3d at 967.) Consideration must be given to addressing the claims of a third party to alleged marital property. See *Schweihs*, 222 Ill. App. 3d at 894; *Peshek*, 89 Ill. App. 3d at 965; Ill. Rev. Stat. 1987, ch. 40, par. 403(d).

Neither party elected to join Harriet as a party to the litigation. Therefore, it may follow that the trial court may have been limited in

its ability to make a complete determination regarding the property, since any determination may have adversely affected the rights of Harriet. From the evidence presented, the trial court erroneously ruled that the house was nonmarital property and obviated any determination as to any interest pertaining to Harriet.

Under these circumstances, a new hearing is necessary to afford the trial court the opportunity to make a complete determination of the alleged adverse interests of the parties and the alleged third-party claim, if any, of Harriet. We therefore vacate the trial court's judgment regarding the classification and distribution of the property, vacate the trial court's orders of August 17 and August 20 regarding Helen's motions to enjoin the sale of the property and void the deed of conveyance, and vacate our stay of judgment pending appeal.

In view of our decision, we find it unnecessary to address Helen's claim relating to the insurance proceeds, since we hold that the questions of the classification and distribution of the property must be further determined on remand to the trial court.

■ Helen's further contention that the trial court erred in awarding joint legal custody of their three children does not merit further consideration on appeal, as she failed to cite any authority in support of her argument. *Hassan v. Wakefield* (1990), 204 Ill. App. 3d 155, 561 N.E.2d 1160; 134 Ill. 2d R. 341(e)(7).

■ We next consider Ted's cross-appeal from the award of attorney fees of $6,000 to be paid by him to Helen's attorney. Ted argues that Helen's contract with her attorney is void because it provides for interest in excess of the legally allowed interest rate of 9%; that it provides for payment of attorney fees from any recovery, contrary to public policy, and that it provides for division of fees in violation of the Rules of Professional Conduct (134 Ill. 2d Rules 1.5(f), (g), (i)).

On appeal, the judgment of the trial court regarding payment of attorney fees will not be disturbed absent an abuse of discretion. (*In re Marriage of Westerlund* (1989), 193 Ill. App. 3d 56, 549 N.E.2d 820.) Ted has failed to show that the court abused its discretion in awarding Helen attorney fees.

Ted's reliance on *Licciardi v. Collins* (1989), 180 Ill. App. 3d 1051, 536 N.E.2d 840, is misplaced. The trial court found that Helen's contract with attorney Michael Canulli did not provide for contingency fees, as did the contract in *Licciardi*, but for hourly representation. The trial court also found that Canulli's contract did not provide for interest in excess of the legal limit, but rather for a late payment fee of 1% a month on outstanding balances. In addition, the record indicates that Ted stipulated to Canulli's hourly rate. The rec-

ord further shows that Helen was never charged a late fee and that the case was never referred to co-counsel or another attorney.

We find no merit in Ted's further contention that the petition for attorney fees fails to properly itemize the dates set forth for rendering of services in accordance with *Kaiser v. MEPC American Properties, Inc.* (1987), 164 Ill. App. 3d 978, 518 N.E.2d 424. *Kaiser* merely requires that detailed time records be maintained containing facts and computations upon which charges are predicated, and that such information be contained in the petition for fees. The trial court found the petition sufficient to award fees based on documents produced at trial.

For the above reasons, the judgment of the trial court is affirmed pertaining to the dissolution, the custody, and the attorney fees, and reversed and remanded for further proceedings to classify and distribute the property.

Affirmed in part; reversed and remanded in part.

BUCKLEY, P.J., and MANNING, J., concur.