JOHN D. BIELECKI *et al.*, as Beneficiaries of Trust No. 8639, Plaintiffs and Counterdefendants and Appellees and Cross-Appellants, v. PAINTING PLUS, INC., Defendant and Counterplaintiff and Appellant and Cross-Appellee.

First District (1st Division)    No. 1—92—2489

Opinion filed May 31, 1994.—Rehearing denied July 20, 1994.—Modified opinion filed July 25, 1994.

Steven J. Rosenberg, P.C., of Chicago, for appellant.

John D. Bielecki and Brigid M. Bielecki, appellees *pro se.*

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Defendant, Painting Plus, Inc. (PPI), appeals from an order of the circuit court of Cook County entered June 23, 1992, denying its post-trial motion to vacate the court's order of April 22, 1992. The order of April 22, 1992, granted various relief to plaintiffs, John D. Bielecki and Brigid Bielecki, as beneficiaries of Standard Bank trust No. 8639 (Bieleckis), regarding a real estate sales contract for the construction of a luxury home. Plaintiffs cross-appeal, requesting an award of attorney fees. For the following reasons, we affirm the judgment of the trial court.

The record reveals the following relevant facts. On October 22, 1990, plaintiffs filed a two-count complaint against defendant, seeking declaratory relief and specific performance of a contract for construction of a luxury home. On April 5, 1991, plaintiffs amended their complaint to include a count alleging breach of contract.

In count I, plaintiffs alleged that on May 12, 1988, they entered into a real estate sales contract for the purchase of lot 50 in the Crystal Tree subdivision located in Orland Park, Illinois. Plaintiffs agreed to purchase lot 50 from defendant for $100,000, and to employ

defendant to construct a "French Chateau" model home on lot 50 for $360,000. On September 7, 1988, plaintiffs paid defendant $100,000 for the purchase of the lot 50, and defendant conveyed lot 50 to plaintiffs.

The contract provides that the cost of construction is based upon construction of a single-family residence of approximately 4,000 square feet at $90 per square foot. The contract further provides for adjustment to the cost of construction as follows:

"1. *** Price is based on a 4,000 square ft. home at $90.00 per square ft. Actual square footage and price is dependent upon finished print, and date the construction begins."

Attached to the contract is a "Construction Exhibit" which provides in pertinent part:

"2. Before any construction work, the plans and specifications must be first reviewed ánd approved by the Crystal Tree Architectural Committee. Seller will assist, but cannot guarantee such approvals. The contract price (estimated on the first page) will be rebid when Purchaser's plans are complete and before submission to the committee. Purchaser must approve the rebid amount. If Purchaser's approval is not received and Purchaser elects to void this agreement, then the money previously paid to the Seller shall be returned, less $10,000.00 to cover Seller's assistance and services in assisting the architect and in presenting Purchaser's plans and specifications.

If, after revisions as may be required by the Crystal Tree Architectural Committee, the cost of this contract shall, (when rebid to accommodate these revisions), exceed 10% of the price approved on the rebid plans, and Purchaser may elect to void this agreement, in which case $15,000.00 shall be retained by Seller and the balance of any money theretofore paid by Purchaser will be returned to Purchaser."

Prior to the preparation of the plans and specifications, plaintiffs requested an additional 680 square feet be added to the French Chateau model, bringing the total square footage to 4,680 square feet. Plaintiffs further ordered additional contract extras totalling approximately $38,520 over and above items originally specified in the contract, but that did not substantially impact the costs of construction on a square-footage basis. Plaintiffs offered to pay defendant for the additional 680 square feet ordered in accordance with the terms and provisions of the contract.

Plaintiffs alleged that the Crystal Tree Architectural Committee reviewed and approved the architect's plans and specifications without change, and consequently, no revisions or additional costs to the construction of the home were required by the Crystal Tree Architectural Committee.

On or about March 30, 1990, defendants demanded that plaintiffs execute an addendum to the real estate construction contract (Addendum). The Addendum proposed that defendant would construct the French Chateau model for a total cost of $750,528. Plaintiffs stated that the French Chateau model provided for in the contract is substantially similar to the French Chateau model provided for in the Addendum, and that after contract adjustments for an additional 680 square feet were made at an additional cost of $61,200 (680 square feet at $90 per square foot), and an adjustment made for contract extras totalling $38,520, the net increase in the cost of construction as proposed in the Addendum was approximately $191,800. Plaintiffs alleged that the additional costs demanded by defendant in the Addendum were grossly excessive and unwarranted by the changes in the scope of construction.

The contract provided that defendant commence construction of the French Chateau model between April 1, 1990, and September 1, 1990, and complete construction within one year from the date construction began. Plaintiffs alleged that despite this contractual requirement, and repeated demands by plaintiffs, defendant refused to commence construction for the price stated in the contract and therefore materially breached the terms and provisions of the contract.

Plaintiffs requested that the court construe the contract and determine the contract prices for construction of the French Chateau model and declare that defendant is in material breach of the construction contract.

In count II, plaintiffs requested specific performance of the construction of the French Chateau model in accordance with the terms and conditions of the contract and, in the alternative, compensatory damages in the amount of $200,000 plus costs.

In count III, plaintiffs alleged damages in excess of $100,000, by virtue of defendant's numerous breaches of the real estate sales contract and requested a judgment against defendant, as well as costs and other additional relief.

In response, defendant filed an answer and the affirmative defenses of "no final contract," stating that no final contract existed between the parties, and "satisfaction," stating that defendant has complied with the real estate contract, and, therefore, the agreement that does exist between the parties has been satisfied. In addition, defendant filed a two-count counterclaim, alleging that plaintiffs breached the real estate sales contract and that plaintiffs obtained copies of the architectural plans from defendant through misrepresentation.

A bench trial commenced before the trial court on March 11, 1992. Joseph Anthony Bell, president and sole shareholder of PPI, testified as an adverse witness in the plaintiffs' case in chief. Bell initially testified that no "hard date" was ever set for construction of the plaintiffs' home on lot 50, and that he did not know that the plaintiffs wanted to build the French Chateau model home on lot 50.

Plaintiffs' counsel showed Bell exhibit 16, the architectural plans prepared by Anderson Associates Architects, Inc. The plans depicted the front, side, and rear elevations of the French Chateau model, and included a basement recreation room which was to house an indoor swimming pool. The plans showed a total building area of 5,343 square feet, including 780 square feet for the recreation area. Bell stated that he prepared an estimate of the cost of construction for the home as shown on the plan, including the recreation area, for $895,600, not including the $100,000 price of lot 50, which he submitted to plaintiffs in January 1990. Bell stated that plaintiffs did not approve the bid, but instructed him to take the pool/recreation area out and rebid the house.

Bell stated that on March 30, 1990, he submitted a rebid Addendum for construction to the plaintiffs for a total of $750,520, including $100,000 for lot 50. Bell agreed that the square footage of the floor plan without the recreation area totalled 4,563 square feet, and that PPI was billed $3,000 for revising the architectural plan to remove the recreation area. He stated that he offered the plaintiffs a discount to $740,000 if they signed the contract within 15 days. Bell agreed that the new bid price divided by 4,563 square feet, calculated to a charge of $140.37 per square foot.

Bell stated that plaintiffs never signed the rebid proposal. Plaintiffs' counsel showed Bell plaintiffs' exhibit 11, a "sworn contractor's statement," which Bell prepared in response to plaintiffs' inquiries as to defendant's method for the pricing of the home. The document listed 37 categories of construction. Bell stated that the document was a "bidding tool," but not a "sworn contractor's statement." Bell referred to the document as "just some of my notations."

Bell admitted that the document failed to specifically identify the subcontractors that were to perform the construction duties, but did assign corresponding dollar values to each category of construction. For example, Bell designated a category for "lumber and materials," totalling $95,000. Bell explained that although the total bid for lumber by Schilling Brothers Lumber was listed as $90,600.70, he raised it to $95,000 as a "contingency" in case he needed additional lumber at the site, explaining that "at this particular point in time,

lumber was extremely volatile." Bell further explained, "I made the number up for the lumber, I made the number up for the trim, due to my experience."

Attached to the document for the purpose of backing up the cost of construction were proposals from various subcontractors, including Schilling. Schilling's proposal was doubled by defendant in its bid. For example, Bell's proposal for material and labor for oak stairs totalled $13,500. In addition, the proposal by Schilling called for a circular stair allowance of $10,279.99.

Bell explained the discrepancy by stating that he does not usually get lumber from Schilling because it "is at an extremely far distance from the property," and that "Schilling does not bid it in accordance with the requirements of Orland Park." He stated that he usually gets lumber from "Batty" in Orland Park. However, no proposal from "Batty" for lumber was attached to defendant's bid.

Similarly, the bid appeared to provide for two cedar shake roofs. Bell designated $20,000 for roofing. Bell stated that his price was based on a subcontractor proposal from Roof-rite for labor and materials. Meanwhile, the Schilling proposal included an entry for "70 squares of number 1 heavy cedar shakes" at a total cost of $6,993. Bell asserted that Schilling Lumber's estimates were often off by 10% to 25%. He stated that PPI was not going to deliver two roofs to the house.

Bell testified that his second bid contained in the March 30, 1990, Addendum did not provide for a recreation room. However, the bid included a proposal from Schilling for six patio doors in the amount of $4,131.64, which were designated as doors for the recreation room. In explaining the inclusion of the patio doors in the bid, Bell stated:

> "Because of the fact that it is very difficult to predict the actual lumber and material costs *** I have to cover that, and make sure I don't have to go back later and ask for more money. I rather give money back rather than take more at a later date."

At this point, the trial judge called counsel for both parties into his chambers for a conference off the record. Following the interruption, Bell's testimony continued.

Bell agreed that his price quoted for materials and labor for installation of oak flooring was $9 per square foot, and that the Addendum provided for 800 square feet of oak flooring. Despite this, the bid reflected PPI's proposal of $12,800 to install and furnish the oak flooring, $5,600 more than the $7,200 total obtained by multiplying $9 by 800 square feet. Bell stated: "I really can't explain this *** it may be a mistake."

Bell testified that the bid contained a contractor's fee of $100,000,

which was to represent 18% of the contract costs. Bell further testified that the bid reflected a charge of $20,000 for painting, caulking and decorating. He testified that PPI was the general contractor on several other homes in Crystal Tree and admitted that there were no other written subcontract proposals from PPI on lots other than lot 50. However, Bell stated: "I'm not making Toll House cookies here. Every one of these homes are [sic] different."

Bell testified that as of the date of the Addendum, March 30, 1990, the value of lot 50 was probably $125,000. He stated that the property appreciated $35,000 between March 30, 1990, and September 1991, and that in September 1991, he entered into a contract with another purchaser to sell lot 50 for $160,000. Bell admitted that his cost for the lot was $75,000 in 1988. He testified that in the fall of 1990, he offered the plaintiffs a refund of $100,000 on two occasions, and later authorized his attorney to offer the plaintiffs a refund of $110,000. He stated that the plaintiffs did not accept these offers.

Following this testimony, defense counsel made a motion for mistrial and recusal, based on the events that occurred in the trial court's chambers. The motion stated that following the second hour of Bell's testimony, the trial court stated in chambers that it found Bell's testimony "preposterous," and resented a witness trying to "fool" him. Defense counsel argued that these remarks of the court demonstrated that the court had prejudged the case and possessed a marked bias against the defendant.

Plaintiffs' counsel responded that defense counsel confused bias with his perception of the court's assessment of the credibility of a witness. The trial court then asked defense counsel if he in fact omitted from his motion his own inquiry to the court, in chambers, as follows: "Judge, I hope you're not prejudging the case," to which the trial court replied, "No," if not, to the trial court's recollection, "Heavens to Betsy, no." Defense counsel admitted that this exchange in fact occurred and was not referred to in his motion. The trial court then denied defendant's motion.

Richard Majher, a general contractor operating R.S.M. Construction, testified as an expert witness on plaintiffs' behalf. Majher stated that R.S.M. specializes in construction of deluxe, custom homes, ranging in price from $300,000 to $700,000, and in size from 3,200 to 7,500 square feet. R.S.M. has not built a home in Crystal Tree.

In June or July 1990, plaintiffs asked Majher to bid on the construction of the French Chateau model home. Majher prepared a proposal based on a list of specifications, pictures and photographs given to him by plaintiffs. Majher obtained at least three bids from subcontractors for each category of construction and then selected

one bid from each category to include in the proposal. Majher submitted his own bid for the trim work and a follow-up on the rough carpentry. Majher submitted a proposal dated August 30, 1990, to plaintiffs, estimating construction at the firm price of $414,080, the price guaranteed until January 30, 1991. Majher testified that there was not any significant change in the cost of materials or labor pertaining to the construction of a home like the French Chateau model between March 1990 and August 1990.

In October 1991, Majher was retained as an expert by plaintiffs. He reviewed and analyzed the March 30, 1990, Addendum. He rearranged the categories from his own bid to correspond to the categories in defendant's bid, to compare identical items and identical costs. He concluded that the total cost for his bid was $536,000 including a lot cost of $100,000. In Majher's opinion, the current prices indicated that the French Chateau model house could be built for $436,567.

Majher noted that he and defendant did not bid the same plan and specifications for the house. He found that there were numerous items on defendant's Addendum that called for allowances or identified costs that did not relate to the Addendum, and therefore he engaged in further analysis of each category to determine the true costs.

Majher's analysis disclosed a number of discrepancies between defendant's contractor's statement and previous documentation that were not included in the Addendum. For example, in his contractor's affidavit, defendant allowed for $26,000 for cabinetry, while on the Addendum, Defendant listed an allowance of $20,000 for cabinetry. In addition, Majher discovered that the Addendum included areas that appeared to be covered more than once. In order to identify those items, Majher divided the basic categories into two categories of construction. Group 1 consisted of those items that defendant documented either as double charges or overcharges for both materials and labor. Majher identified the group 1 double or over charges, including defendant's 18% overhead, as $102,867.68. Majher identified group 2 as "bumps," items that were listed as costing more than the current market price at the time and were not justified by defendant. Group 2 bumps totalled $151,017.

As an illustration, Majher noted a number of references to construction materials for the recreation room and pool, which were not to be included in the rebid, including: patio doors, for a total of $4,390; skylights, excluded by the contract documents, but included in the costs provided by defendant at a cost of $1,529; V-joint cedar for $918; Laminated beams for the pool for $638; a cedar shake roof,

made up of 12 to 14 squares of shingles at $99.99 per square, for a total of $1,488; lumber for the walls and roof of the recreation room, at a cost of $2,827; two exhaust fans, at an unspecified cost; and $5,200 for a furnace and ductwork. Majher calculated the total of recreation room items improperly included in defendant's bid as $28,230.

Majher also identified a duplication of materials in the Addendum regarding, for example, roofing, doors, and garage doors. Majher noted that defendant's bid included an allowance of $4,000 for garage doors. He stated that the garage doors specified did not fluctuate in price and that the price list for the doors was readily available. Majher quoted a price of $1,796 in his bid for the garage doors specified. Majher identified a roofing overbid of $2,420.

Majher also noted a category called "miscellaneous" in the defendant's Addendum, which in his opinion included improper charges. The "miscellaneous" category included engineering reports, surveys, inspection fees, and hanging of shower doors. Majher stated that the inspection fees were already included in the permit costs, and the hanging of shower doors is normally included in the plumber's bid. Defendant's bid included a charge of $13,500 for clean up and dumpster fees, which Majher stated could have been performed for $4,000. Majher testified that defendant's general contracting fee of $100,000 was overstated by $64,460.

At the close of the plaintiffs' case, the trial court entered an order granting defendant's motion for directed finding as to count II of plaintiffs' complaint for specific performance.

Bruce Sperling, a home builder with the firm of Beechen, Dill and Sperling, testified as an expert on defendant's behalf to corroborate Bell's testimony. He stated that he has built homes at Crystal Tree ranging in cost from $500,000 to over $1 million, and that defendant has built two or three houses in Crystal Tree. Sperling examined Bell's Addendum and determined that the proposal was fair and reasonable, based on a comparison to his own cost sheets for a house that he built in Crystal Tree. Sperling admitted that the house he built was not the same as the French Chateau model at issue.

Sperling stated that he compared defendant's Addendum to past homes he built with respect to the square footage and the interior trim work. As an offer of proof, Sperling referred to 18 pages of notes detailing his comparison, which he prepared subsequent to his prior deposition taken pursuant to Rule 220 (134 Ill. 2d R. 220). The record indicates that the 18 pages of notes were presented to plaintiffs' counsel for the first time upon the morning of Sperling's trial

testimony. The trial court disallowed use of the notes, as well as testimony from them, but stated that the notes could be a part of the record as an offer of proof.

Sperling stated that he reviewed R.S.M.'s proposal and concluded that the proposal was not fair and reasonable "because everything was held to a bare minimum." Sperling cited, *inter alia*, R.S.M.'s carpentry and hourly rate of $28.50 as very low, and R.S.M.'s profit and overhead of $35,000 as "probably" not enough to cover contingencies. Sperling stated that reasonable profit and overhead for a house like the French Chateau model is $110,000. Sperling also stated that R.S.M.'s proposed costs for brick, plumbing, lumber, excavation, painting and decorating "seemed" too low by thousands of dollars. Sperling concluded that R.S.M.'s bid was too low by $202,100.

On cross-examination, Sperling admitted that he never prepared a proposal for the construction of a French Chateau model home on lot 50 but, rather, compared his costs for a home he built on lot 89 in Crystal Tree to the R.S.M. proposal and to Bell's Addendum. Sperling did not present his cost sheets for the home he built in Crystal Tree. Sperling agreed that at his prior deposition, he did not express an opinion as to any dollar amounts that the R.S.M. bid was deficient. He admitted that he did not analyze the subcontractor's bids submitted by R.S.M. until after his deposition.

Following the trial, the trial court ruled in favor of the plaintiffs. On April 10, 1992, the trial court submitted a written memorandum of opinion detailing his findings, stating that the plaintiffs proved by "clear and specific evidence that the terms of the contract were sufficiently definite to constitute a meeting of the minds." The court found that it was the intent of the parties to purchase lot 50 and build a specific house on the lot for a specific price, and that the parties intended to, and did, reduce the intended house to architectural plans. The trial court found Bell's testimony unconvincing and his rebids "suspect." The trial court further found Sperling's testimony lacking in foundation. By contrast, the trial court found the testimony of plaintiff's expert witness, Majher, believable and logical.

On April 22, 1992, the trial court entered an order: (1) awarding the plaintiffs specific performance of conveyance of lot 50 as contracted for purchase by plaintiffs; (2) confirming the court's prior holding denying specific performance as to construction of a home on lot 50; (3) holding that if plaintiffs should use the architectural plans drawn up by defendant for the purpose of constructing a home on lot 50, the plaintiffs shall pay defendant $3,700; (4) awarding the plaintiffs damages for breach of contract in the amount of $160,000,

and holding that defendant is not entitled to charge plaintiffs $15,000 for breach of contract; and (5) finding for plaintiffs and against defendants on counts I and II of defendant's counterclaim, and dismissing defendant's counterclaim with prejudice.

On May 6, 1992, defendant filed a post-trial motion seeking to vacate the trial court's order of April 22, 1992. The trial court entered an order denying defendant's post-trial motion on June 23, 1992. Defendant's timely appeal followed.

We note at the outset that plaintiffs' *pro se* brief does not respond to the issues raised by defendant with any citation to authority, but rather, asserts that the judgment of the trial court be affirmed based on the record and the memorandum of opinion of the trial court. Defendant's reply brief suggests that because plaintiffs' brief does not conform to Supreme Court Rule 341(e)(7) (134 Ill. 2d R. 341(e)(7)), this court should disregard plaintiffs' brief and reverse the judgment of the trial court.

■ Plaintiffs' *pro se* status affords them no special dispensation from the format mandated by the supreme court rules. Although their right to appear *pro se* is well established, it is equally well established that when they do appear *pro se*, they must comply with the established rules of procedure. (*Biggs v. Spader* (1951), 411 Ill. 42, 46, 103 N.E.2d 104, *cert. denied* (1952), 343 U.S. 956, 96 L. Ed. 1356, 72 S. Ct. 1051.) However, this court has found that our jurisdiction to entertain the appeal of a *pro se* plaintiff is unaffected by the insufficiency of his brief, especially where the court has the benefit of a cogent brief of the other party. (*Tannenbaum v. Lincoln National Bank* (1986), 143 Ill. App. 3d 572, 575, 493 N.E.2d 143.) In the present case, this court is assisted by a record which includes a detailed, written memorandum of opinion of the trial court. Thus, we consider the merits of the present case in light of the record on appeal.

■ Initially, defendant contends that the trial court erred in denying its motion for mistrial and recusal. Defendant argues that the basis of the motion was "the Court's extreme and personal bias against Joe Bell as manifested during an angry in-chambers conference with counsel." Defendant cites no authority for this contention. Bare contentions without citation of authority do not merit consideration on appeal and should be rejected. (*Healy v. Bearco Management, Inc.* (1991), 216 Ill. App. 3d 945, 576 N.E.2d 1195.) We therefore find that defendant has waived this issue for review by this court.

Next, defendant contends that no contract was formed for the sale of lot 50 and the construction of a French Chateau model home on lot 50, because the content of the agreement was uncertain and mutual assent between the parties was lacking.

The essential terms of a contract must be definite and certain in order for a contract to be enforceable. However, a contract is sufficiently definite and certain if the court is able, from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties agreed to. *Midland Hotel Corp. v. Reuben H. Donnelley Corp.* (1987), 118 Ill. 2d 306, 515 N.E.2d 61.

Defendant first asserts that "every aspect of the contract relating to price was uncertain and indefinite." Defendant argues that no contract existed because: (1) at the time of the signing, May 12, 1988, no finished print existed and construction was not to begin until June 1, 1990; (2) the construction exhibit attached to the contract refers to an "Architects Plan to be inserted"; and (3) the "Rider and General Specification Sheet" attached to the contract refers to a "Plan No. *To Come.*" (Emphasis in original.) Defendant cites the following testimony of John Bielecki as illustrating that there was never an agreement between the parties as to the specifications:

> "DEFENSE COUNSEL: Mr. Bielecki, let me refer to your deposition taken 17 October 1991 at 1:30 in my office. Do you recall being deposed at that time?
> BIELECKI: Yes.
> DEFENSE COUNSEL: And at that time, did I ask you this question and did you give me this answer—
> * * *
> 'Question: Well, did you ever come to an agreement as to the specifications that would be included in this house?'
> 'Answer: No. I think that's why we are here today.'
> Were you asked that question and did you give that answer?
> BIELECKI: Yes."

Defendant further asserts that Bielecki was "cautioned *by his own lawyer*—that the final price would be impossible to predict." (Emphasis in defendant's brief.) As illustration, defendant quotes the testimony of Richard Loritz, defendant's lawyer, who testified as to a conversation he heard between Bielecki and Bielecki's attorney, Jim Moster, during negotiations for the contract wherein Moster stated, *inter alia*:

> "I don't like the deal that takes a year and a half to two years to put together. I don't like signing a contract where you're going to pay for something but you don't know how much you're going to pay a year or a year and a half from now."

Despite defendant's contentions, the record shows that the contract was negotiated over a period of time and that both parties were represented by attorneys. The trial court found that the contract reduced to writing the plaintiffs' intentions to purchase a specific lot

(lot 50) for a specific price ($100,000) and build a specific home (French Chateau) on that lot for a specific price ($360,000), at the price of $90 a square foot. The record shows that the contract further provided that the parties intended to reduce the intended house to architectural plans with the price based on a 4,000-square-foot home at $90 a square foot, and the actual price depending upon the finished print and the date construction begins, to wit:

> "Price is based on a 4,000 square ft. home at $90.00 per square ft. Actual square foot and price is dependent upon finished print, and date the construction begins."

The record shows that the plan was prepared by the architects, and submitted to the architectural committee. Thereafter, defendant submitted a bid to plaintiffs. The record shows that although the contract required defendant to submit the rebid on the house to the plaintiffs prior to submitting the plans to the committee, defendant in fact submitted the plans to the committee before giving the rebid to the plaintiffs.

The record shows that the plans were approved by the committee. The trial court concluded that the plans met the requirements of the Village of Orland Park based on Bell's testimony referring to certain building code requirements and the lack of testimony from the village that the code imposed additional requirements over and above the approved plan.

The trial court found that the evidence at trial showed the parties' intentions that the price of the house depended upon: (a) the final size of the house in square footage; (b) whether the plans and specifications contained such specialized items of construction that increased the square footage price over and above the $90-per-square-foot estimate; and (c) the current cost of material and labor at the time of construction. The trial court found that the agreement had two parts: (1) the conveyance of lot 50 in consideration of the initial payment of $100,000, along with certain attached conditions, including building a certain house on the lot; and (2) the agreement on the price of the house based on the plans and specifications for a specific house to be built.

As to part one of the agreement, the record indicates that the plaintiffs paid defendant $100,000 for the lot. The trial court found that plaintiffs' exhibit No. 16, consisting of a five-page "schematic of a $9^{1}/_{2}$ room brick veneer and frame two story residence with garage," evidenced that the plans and specifications for the house to be built were agreed upon and not in dispute. The trial court determined that the fact that the plans were not inserted in the physical contract put form over substance and disregarded the actions of the parties which indicated the parties' agreement upon the plans.

Every contract implies good faith and fair dealing between parties to it, and where the instrument is susceptible of two conflicting constructions, one which imputes bad faith to one party and another which does not, the latter construction should be adopted. (*Calumet Construction Corp. v. Metropolitan Sanitary District of Greater Chicago* (1991), 222 Ill. App. 3d 374, 581 N.E.2d 206.) The trial court concluded that defendant's rebid of $740,000 (taking into account defendant's promised "discount" to plaintiffs for signing within 15 days) was not made in good-faith. The trial court found Bell's testimony regarding the costs for constructing the French Chateau unconvincing and his rebids "suspect." The trial court concluded that the defendant was not entitled to rebid *any* amount he wanted per square foot, but that his estimate must be based on a good-faith estimate of what the actual cost of the contract was to perform, based upon securing subcontractor and material men proposals. This is illustrated by Loritz' testimony at trial:

"PLAINTIFFS' COUNSEL: Now, Painting Plus, Inc. didn't have an unrestricted right to bid whatever they wished for that house, did they?

* * *

LORITZ: No, they did not have an unrestricted right to bid whatever they wished."

From the terms and provisions of the contract, this court can ascertain a contract between the parties for the sale of lot 50, and the construction of a specific home, the French Chateau, on the lot for a specific price. Thus, we find that the trial court correctly determined that an enforceable contract exists.

Next, defendant contends that the trial court erred in excluding evidence of defendant's business practice of refunding unused monies. At trial, defendant's attorney asked Bell on direct examination in the defendant's case the following question:

"Do you have a *custom, practice and policy* over the years that you've been remodeling and building houses with respect to refunding monies to customers?"

The trial court sustained plaintiffs' counsel's objection to this question. Defendant contends that the sustaining of this objection, and a second objection to a similar question posed later was error, and demonstrated the court's bias against defendant.

■ Defendant omits crucial facts from his portrayal of the events at trial. The record shows that following the sustaining of the first objection, the trial court entertained a lengthy explanation by defense counsel, whereafter the trial court recognized that the contract provided:

"6. Where the term 'allowance' is used herein, it refers to an amount of money provided for herein for the purpose designated. In the event that the cost of the work performed is more or less than the amount of the allowance, the Purchasers shall be charged or credited for the difference."

Thereafter, the trial court stated that it would allow testimony that in regard to categories A through J of the contract, if the actual cost was more or less, that price would either be credited or debited against the purchaser. To this, defense counsel responded: "I understand" and "I don't have a problem." Thereafter, defense counsel posed the second question to Bell:

"Does Painting Plus or did Painting Plus have a policy practice or custom regarding the return to customers of monies unused in construction, but drawn out by the builder?"

The trial court sustained plaintiffs' counsel's objection to this question. The record indicates that defense counsel did not attempt to inquire of Bell regarding credits for allowances in categories A through J of the contract, as agreed.

Defendant's reliance on *Webb v. Pacific Mutual Life Insurance Co.* (1952), 348 Ill. App. 411, 109 N.E.2d 258, is misplaced. *Webb* involved a dispute over payment of benefits under an insurance policy, and whether a premium notice had been sent to the policy holder. The *Webb* court held that if there is some evidence of the mailing of a particular letter, the evidence with respect to this practice is material. (*Webb*, 348 Ill. App. at 415, 109 N.E.2d at 259.) The posting of mail and notices is not an issue in the present case.

When interpreting a written agreement, evidence of custom and usage may be used only when the writing is ambiguous. (*USG Interiors, Inc. v. Commercial & Architectural Products, Inc.* (1993), 241 Ill. App. 3d 944, 950, 609 N.E.2d 811.) Here, the contract for sale is unambiguous, and the general rule that the trial court must derive the parties' intent solely from the writing itself is applicable. (*Rakowski v. Lucente* (1984), 104 Ill. 2d 317, 323, 472 N.E.2d 791, 794.) We therefore find that the trial court did not err in limiting defense counsel's inquiries to the terms of the contract.

■ Next, defendant contends that the trial court erred in refusing to allow Sperling to testify as to the reasonableness of defendant's bid. Defendant cites no authority in support of this contention; therefore, this issue is waived. *In re Marriage of Olbrecht* (1992), 232 Ill. App. 3d 358, 597 N.E.2d 635.

Nevertheless, the trial court properly found Sperling's testimony lacking sufficient foundation without a comparison blueprint of one of the homes he built and the French Chateau. The record shows

that Sperling never prepared a proposal for the construction of a French Chateau model home on lot 50, but rather, compared his costs for a home he built on lot 89 in Crystal Tree to the R.S.M. proposal and to Bell's Addendum. Sperling did not present his cost sheets for the home he built in Crystal Tree. Sperling agreed that at his prior deposition, he did not express an opinion as to any dollar amounts that the R.S.M. bid was deficient. Sperling further admitted that he did not analyze the subcontractor's bids submitted by R.S.M. until after his deposition.

■ Finally, defendant contends that the trial court erred in awarding lot 50 to the plaintiffs. Defendant does not support this contention with any citation to authority and has therefore waived this issue for review. *Olbrecht*, 232 Ill. App. 3d 358, 597 N.E.2d 635.

■ In their cross-appeal, plaintiffs request that this court award to them attorney fees and costs for the litigation. Plaintiffs have failed to present a sufficient argument along with citation to authority in support of this contention. A reviewing court is not required to search the record to reverse, since it is the responsibility of the appellant to point out where the trial court has erred. (*Bell Federal Savings & Loan Association v. Belcastro* (1983), 115 Ill. App. 3d 281, 450 N.E.2d 830.) We therefore deem this issue waived for review.

For the reasons stated above, the judgment of the trial court is affirmed.

Affirmed, as modified.

O'CONNOR and MANNING, JJ., concur.